This is our last case of the day, 4-13-1025, Lois Lindorff et al. v. The Department of Central Management Services et al. On behalf of the appellant is Attorney Baker, on behalf of the appellee, Attorneys Purcell and Mrozowski. Did I say that right? It is correct. Okay. And you've divided your time it looks like to me. Ashley and I requested an additional five minutes and it was brinked through. Okay. So it looks like you're taking 20 and you're taking five from what the clerk tells me. Okay, great. All right. Mr. Baker, are you ready to proceed? I am. Okay. Good afternoon. May it please the Court. Counsel. My name is James Baker. I'm appearing on behalf of Deborah Fuqua and Lois Lindorff. Each of my clients serves the Illinois Department of Corrections as a Health Care Unit Administrator at a correctional facility. The issue that brings us to this Court turns upon whether the State Labor Board properly excluded my clients from collective bargaining status relying upon Section 6.1b-5 of the State Labor Act. That particular section of the Labor Act is recently new, is fairly new. And it was enacted to authorize the Governor of the State of Illinois to designate a limited number of positions in state government from collective bargaining status. The way the Act is structured in order for a position to be excluded, it has to meet certain requirements. And those requirements are set forth in Section 6.1b of the Act. It lists five separate ways that a position can qualify for exclusion from collective bargaining status. And without mentioning each of them specifically, I think it's an accurate statement to say that positions that qualify for exclusion are either upper-level management positions, positions that involve policymaking, or positions in which the person holding that position has a confidential relationship with someone in management. The subparagraph that we are dealing with is Section 6.1b-5, which qualifies a position for exclusion from collective bargaining if that position has the authority to make substantial and independent discretionary actions. Section 6c of the Act describes how a position can meet the requirements of Section 6.1b-4. And there are three ways. Only two of those ways are relevant to this appeal. And in each of those ways, the position has to have the authority to engage in executive and management functions for a state agency. Once you meet that particular qualification, under the first prong, the position has to have the authority to be charged with the effectuation of management policies and practices of a state agency. Under the second prong, once the person reaches the executive and management function, he has to have the authority to represent management interests by taking or recommending discretionary actions that effectively control or implement the policies of a state agency. Now, when this case was litigated before the Board in its decision, it concluded that in many respects, the position of a health care unit administrator did not have the requisite authorities to qualify for exclusion under that subsection. It reasoned that in order to qualify for the exclusion, no part of an incumbent's job would have the authorities of the type prescribed in Section 6b-5. And it held that with respect to the position of a health care unit administrator, it met the requisite qualifications in two respects. The first was the role a health care unit administrator plays in monitoring the activities of a vendor who provides health care services for the state at a correctional facility. The second way was the role that a health care unit administrator had in the promulgation of what is called administrative directives and what is called institutional directives. And an administrative, and I guess the best way to understand this, is the Department of Corrections is a paramilitary organization. It operates on policies, and it has volumes of policies of various types. And the policies are developed at two levels. The first is at the departmental level, and those are called administrative directives, which apply to every correctional facility. Institutional directives are those that apply at a particular correctional facility. And it's important to understand that an institutional directive cannot be inconsistent with the requirements of an administrative directive. Now, in considering this case, I think it's important to recognize facts that are clearly not in dispute in this case. In fact, most of the facts in this case were not in dispute. The first fact is there are 31 correctional facilities in the state of Illinois. Each has a health care unit, and each has a health care unit administrator. The role of the health care unit administrator is particular to that particular correctional facility and no other. The second point to understand is, and I kind of addressed this earlier, a health care unit operates on various administrative and institutional directives. And the direction of this case reflected that there is virtually no aspect of the operation of a health care unit that is not touched by an administrative directive or an institutional directive. The third point to understand is that most of the authority of a health care unit administrator, certainly as to the determination made by the labor board, came from monitoring the activities of the vendor. In this case, the vendor is an organization called the Wexford Corporation, which provides health care services for the department. And at the facilities where Ms. Lindor and Ms. Buqua worked, all health care services were provided by Wexford. The department engaged in absolutely no health care activity on its own. It was all contracted out. And the authority of Ms. Buqua and Ms. Lindor, with respect to Wexford, was to monitor its compliance with requisite policies. Now, it's important to understand, that doesn't mean that they could make independent judgments as to whether Wexford was doing a good job or a bad job. They were circumscribed by three things. The first thing was a Wexford contract. It was a written instrument, very detailed, that specified what Wexford's obligations were to the department. The second were laws and regulations which dealt with providing health care services, particularly in a prison environment. And the third were the administrative directives and the institutional directives. And the authority of a health care unit administrator was limited to reviewing the activities of Wexford to make sure what it was doing complied with those particular regulations, contracts, and policies. And they did that by preparing a monthly report. Now, the report had six pages of instructions telling a health care unit administrator what she had to do in filling it out. There was virtually no independent discretion that a health care unit administrator had in the process of filling out the report, other than to the limited extent she could make a judgment that something was not significant enough to include in the report. That was it. The health care unit administrator had no authority to fill out these forms. They don't have to be a registered nurse. No, they do have to be a registered nurse. If it was just filling out a form that anybody could fill out, why would they be required to be registered nurses? I can't answer that question. There was nothing in the record that spoke to it. I suspect that there are health care units in the state of Illinois where at least presently or at one time health care services were actually provided by the department. That was not the case at times relevant to this proceeding at the health care facilities where my clients worked. The second role my clients had, at least in the minds of the board, was to recommend administrative directives. Now, the only evidence in this record about any role any authority a health care unit administrator had with respect to administrative directives came from the testimony of the medical director of the department who basically said, well, I would welcome hearing the thoughts of a health care unit administrator concerning an administrative directive. He admitted that they have no authority to promulgate administrative directives. That authority rests with him. It is equally clear that the role in promulgating institutional directives involved nothing more than a health care unit administrator making recommendations or sharing thoughts with her chain of command at the institutional level, what might be a good institutional directive to insert. Now, it's our view that the board got it wrong in saying those two activities rises to the level of qualifying for exclusion under 6B.4.5. One of the things that we, and I'd like to turn to prong one if I could. That particular prong talks about, as I stated earlier, the effectuation of management policies and practices of a state agency. The role of the health care unit administrator in monitoring Wexford for compliance did not involve effectuating any policy. At most, it was to make sure Wexford was following a policy. Her only role was to fill out a report provided to her chain of command. She had no role or authority in making any policy decisions pertaining to Wexford. In this case, we feel that in considering the meaning of Section 6, the first prong of Section 6B.4, it is relevant to consider how courts have decided and interpreted the definition of management contained in Section 3J of the Act. The language in each section is nearly identical. And it's our view that if one looks at the cases that have been decided by the higher courts of this state in giving meaning to Section 3J, it is clear that positions that qualify under that section are those where someone has to have hands-on responsibility in effecting policies. It's a situation where you have to be more than an advisor for making recommendations. You have to have hands-on control. And we cited a number of cases in our brief that speaks to that point. Let me ask you, counsel, why isn't making sure Wexford is following policy, effectuating DOC policy? Because what they are doing is nothing more than taking a look at what the department's policies are, as stated in the administrative directives and the institutional directives, and then saying, is what Wexford is doing meaning that? But that's putting into effect DOC policies. I don't think it's putting into effect anything. I think it's just measuring compliance with policy. And another point that should be made, Justice Turner, is that... What's your definition of effectuating? Having some hands-on responsibility of putting some policy in effect. To take some action. In this case, they do nothing more than submit a report, which goes up to her supervisors and on up the chain of command. Now, the way the Labor Board got around that limited role was to say, there can be idiosyncrasies. A policy doesn't cover everything that can possibly occur in a health care unit. And I suppose that's probably true. But those idiosyncrasies that a health care unit administrator must address don't qualify for the statute because they don't involve the effectuation of management policies or practices of the department. They're merely taking some action, rarely does it happen, that is not covered by a policy. How is effectuating management policies different than directing the effectuation of policy? There's clearly a difference because the statute was written differently. The statute was written differently because there had to be some role in it. There had to be some role in directing the effectuation of policy. In my mind, in my way of thinking, and I don't know any cases that has addressed that, directing and effectuating are almost redundant terms. I don't know that there is much difference. So you think effectuating means the same thing as directing the effectuation? What I think effectuating means is putting a policy in place. That seems to be the dictionary definition of that term. And in this case, there is no policy that a health care unit administrator puts in place. The policies are laid out. They're laid out in institutional directives and administrative directives. The role of the health care unit administrator is merely to report as to whether Wexford is or is not complying with a policy. In my mind, that's a far cry from effectuating a policy. The other prong that is pertinent to this case is that an executive or management function must involve representing management interests by taking or recommending discretionary acts that effectively control or implement the policy of a state agency. Now, just looking at the language without considering any caseload, that would essentially mean that someone has to take or recommend some discretionary activity. That's the first requirement. That effectively controls or implements the policy of a state agency. It's painted with a fairly broad brush in terms of the level of authority that is required. In this case, health care unit administrators have virtually no authority with respect to administrative directives, which dictate the policies of the department. And the role they have with institutional directives don't affect the policies of the department. They affect what might happen at one out of 31 correctional facilities in the state. But the language that comes from this particular prong came from the Yeshiva University case, the United States Supreme Court. And that turned upon Quinn was an employee, a management employee under the National Labor Relations Board. And putting some flesh on the bones to the language, the court in Yeshiva said it has to be pretty clear that the employee is doing conventional management functions. And then it went on to state that it has to be a position where there is a lot of hands-on responsibility. In that case, it involved college faculty members who essentially controlled the operation of an academic unit. And that's not the case here. We don't have that in this situation. We're talking about individuals at one correctional facility who have very limited authorities. I see my time is almost up. Does the court have any questions? I don't see any more. Thank you, Mr. Baker. You'll have a chance on rebuttal too. Ms. Burowski is going first. May it please the court, Gail Murzowski on behalf of Respondent Amtsme. I'm not going to repeat the facts. I just want to make a couple points and hopefully address a couple of the questions that were raised. First of all, what these employees do, which I guess is part of the facts, what they do is they really monitor a contract. Not necessarily a policy or directive. There's a contract. It's a contract for medical services and therefore they need medically trained employees. These are professional employees. They are in fact registered nurses to make sure, sort of a quality control situation with the contractor here, which is Wexford. So essentially the issue is whether that is an executive or management function. One of the points that Amtsme wanted to raise in support of what we believe should be a reversal of the board in this case, is that it is necessary that there be an executive and management function that the employees are engaged in based on the language of the statute. Here, the petitioners also make that point and the way the statute is written, we believe that that is a correct interpretation. The actual decision here, although they give a different sort of dichotomy between point A and point B, meaning the responsibility for effectuating discretionary action, which is more the professional standard under Yeshiva, and the executive and management function, which is more the management role. Here, the board agent or the ALJ, as was just adopted by the board, basically considers what they believe are management authority, significant discretionary authority under 6.15 of the Act, to be the same thing, that it is the same authority or alleged authority. Which kind of brings me to whether or not they actually have actual authority. And the board has taken the position in this case and thereafter, but in this case, that it doesn't matter whether it's actual authority, which we believe is not Yeshiva, is not the way the courts have determined what that second prong is, regardless of whether you are or aren't engaged in executive and management authority. The fact that there is a presumption here, here the ALJ found, well, there's a presumption and therefore, there doesn't have to be actual authority, it's enough that they say there's authority. And that has never been the standard. And I'm going to note that although, and I know Justice Turner asked a question about the difference between effectuating and directing the effectuation, and I agree that they did not put that word in, in 6.1C. However, in this case, and in multiple cases thereafter, the board says that they interpret it. They interpret it. That the first portion is what has always been the management standard, with the absence of predominant. Okay, so there's a difference under 6, under the definition of managerial, you have to have predominant. That has to be your predominant duty, executive and management function. They took that out. And they find that to be the difference. And they also find to be the difference, the presumption, or whether, where the burden is shifted to. And that's really it. Other than that, the board decision, and even frankly the argument of respondents here, is that the courts have determined what is an executive and management function, what that means, and also under yeshiva, yeshiva has been adopted by the Supreme Court. And here, it just doesn't meet that burden. We believe that the petitioners did overcome any presumption, that based on the hearing here, there is no basis, it's clearly erroneous, that there was a determination that the activities were executive and managerial, and or a responsible direction. We would ask that you reverse. Thank you. Thank you, counsel. Ms. Purcell? Good afternoon, your honors, counsel. I am Sharon Purcell, Assistant Attorney General on behalf of both the Illinois Department of Central Management Services and the Illinois Labor Relations Board. I'd like to begin, first of all, I just want to note that the exclusion designation was made by the governor through CMS. The board found that it was properly made. So it's not the board's exclusion, it is the governor's exclusion. But I would like to go back because there's a lot of collapsing in on these arguments, it seems to me. So I want to go back and explain what 6.1 actually is and does. And I also want to note that this is the first time that the language of Section 6.1B-5 and then the definitions that are provided in C-1 has been before the appellate court on review. There are approximately 57 other petitions under B-5 that are pending, covering about 1,100 positions. And they're pending in the first district. They were stayed pending the court's decision on a case that was decided yesterday. I don't have... it came out after I was on my way up here. But if the court would like, I can give you the citation to it. That concerned a lot of constitutional arguments. The court, the first district, held that 6.1 is constitutional. So, but I can tell you that was AFSCME versus CMS and the Illinois Labor Relations Board, 2015 Illinois Bill Act First 133454. And it discusses Section 6.1 pretty thoroughly. Now this case, this appeal... But it does not deal with the issue before this court right now? 6.5, 6.1B-5. The issues in particular to this... Right. This is the first time. But there are a lot of... because of the constitutional challenges, because there are so many petitions for review were filed by AFSCME on these cases. Except for in this one, down here in the fourth, which was the individual objectors who filed. AFSCME did not file a petition for review in this case. So those were stayed pending the decision on the constitutionality. Since this wasn't part of AFSCME's appeal, this one went forward. And now that the court has decided it's constitutional, I don't know what will happen. But Section 6.1 is, it's a new procedure. It is, as the board said, it's a new creation. And it does not modify any pre-existing means of determining bargaining units. It's self-contained. It's entirely new means of decreasing the number of state employees in collective bargaining units. And so there's two... The board... whatever Section 6.1 means has to be interpreted with regard to what its purpose was. And this court should affirm the board's decision because the governor properly designated the HCUA positions as excluded from the collective bargaining, from collective bargaining because they are managerial positions under 6.1b5 as it's defined in Section 6.2c1. The board correctly interpreted c1 as providing two separate tests for determining whether a position is managerial. It has managerial authority as required under 6.1b5 before it can be designated for exclusion. The board's interpretation of the act is based on c1's plain language, which the first test modifies. It modifies the traditional test found in Section 3j. It is not the same test. And there's important distinctions there. And then the second test, it's not a second prong, it's a second individual separate test that reflects the judicial analysis of Section 3j as was first articulated by the Illinois Supreme Court in chief judge relying on the US Supreme Court Yeshiva decision. And the board's interpretation is consistent with the simultaneous amendment of the act made to Section 3j. That's how the board got to its two separate tests to permit the governor to exclude positions which are managerial level. And the point of Section 6.1 is to recapture government efficiencies and effectiveness in management. There was, when the General Assembly started to recognize that in the past few years, state employees, the state employment scene had become very heavily unionized so that 96% of state employees were unionized with pending petitions that would have raised that to, you know, I've heard 98%, 99%. And it recognized there was a problem with having managerial level people in, people who were aligned with management and that's where their loyalty should be, having them in bargaining units. There would be agencies that would have, wouldn't have somebody basically in charge at some particular location because a lot of these agencies are complex and large operations. So it created Section 6.1 of the act and it permits the governor, Section 6.1 of the act permits the governor to designate for exclusion from collective bargaining positions that are managerial in nature. Now to designate a position, it must authorize an employee in their position to exercise significant and discretionary authority as an employee. And in the managerial context, that's what we're talking about, the two alternative tests in 6.1C1. So the test, the executive and management functions, which if you've heard an argument, that is not necessary under both tests. That's the first test. The second test is acting, effectively recommending acting in management interest. This is to give the governor needed flexibility to have the... Council, I want to make sure I understand your argument. Are you saying the first test is whether the employee is engaged in the executive and management functions of a state agency and charged with the effectuation of management policies and practices of a state agency? That's the first test. And then the second test, if I'm following your argument, would be represents management interest by taking or recommending discretionary actions that effectively control or implement the policy of a state agency? That's the second test. Okay, I got it. And I want to be clear on that because petitioners and AFSCME, you know, they've collapsed that. And they've also, the other part of this test is that it is the authority. The question under these tests are, what authority does the position give the position holder? It is not what does that position holder actually do? Because depending on whether or not you exercise your authority or the degree to which you exercise your authority doesn't determine the authority of the position. That you may have an employee who, for some reason, prefers not to exercise their authority. Or a supervisor who maybe approaches on that authority. What authority do these two employees have? Well, first of all, it's the position. It's the authority that the position has. What is that authority? It's presumptively, as the board found, they have the authority to engage in executive management functions and charge with the effectuation of management policies and practices of the state agency. In the day-to-day work week, okay, what authority do these two petitioners exercise? The authority these positions have are to effectuate the department's policies with regard to the health care units that they administer. They are health care units. They basically certify compliance with standards, correct? Well, what they do, they report to their superiors, Dr. Schick, Mr. Ashby at Western, and it's based on the decisions whether or not to, for instance, find Wexford, renew the contract, whether or not other certain administrative directives are needed or institutional directives. Those things are based on what information, the information that they get from the health care unit administrators in each facility. Those health care unit administrators have discretion, and that's part of this. They have significant and discretionary authority. They have discretion to decide what they're going to report, whether they're going to report it. So they say, well, we report everything. If that's how you decide to exercise your authority, that doesn't mean that you do not have authority. That means that's how you have decided to exercise your authority. You can exercise it on a continuum from... He has the discretion to say, hey, just knock it off. Don't do it again, and I won't report you for discipline. I'm sorry, but I have a little bit of a cold, and I'm having trouble hearing. Who can do that? The correctional officer. Of an inmate? Yeah. This is effectuating all of the policies of the DOC in their health care unit facilities. So whether or not what the vendor contract requires, what the state and federal requires, all of the directives, which in a hospital you're going to have directives. Health care is complex. It's expensive. You're not going to be reinventing the wheel everywhere. Just because you're complying with directives or making sure doesn't mean that you have no authority. But it's really important here that... I mean, there's two issues here. The first is the test, the proper test, which is two alternative tests under C1. And under each, under 6.1, section 6.1D provides that the governor's designations are presumptively appropriate. So since they're presumptively appropriate, I'd like to go back to section 6.1, C1, the first test, it drops out the preponderance requirement that's under section 3J, which is the traditional managerial test. This is not that. These are separate. They're separate proceedings. And this one is to give the governor what he needs, the tools that he needs, to ensure that the state government is managed the way it needs to be managed, by being able to remove positions. It's on a position basis. Which positions are managerial level? And give this needed authority. You know, the degree to which a particular employee exercises that authority does not affect the authority of the position. So you don't say, well, they don't do that. They have the authority. And it's their burden then to come in after the governor makes his designation to come in and show that they do not have this authority. Nobody's argued here today that, I mean, there's been a, just, it's sort of been, well, here's what, you know, the test is, and it's really the same as 3J, and we're going back to the old tests, the case law. And to the degree that section C1, the first test, talks about executive and management functions, you can look at that. And say, well, okay, what are executive and management functions? But since this is a new, it's a new creation, it is not representation proceeding, it does not, it has no, it doesn't affect, you know, what has gone on in representation proceeding. Counsel, do you attach any significance to the fact the new statutory language dropped the words, in quote, the responsibility of directing, in quote? I think, I think everything that was omitted. I think all the changes are significant. Okay, then I'd ask opposing counsel, what's the difference between the effectuation policy and the responsibility of directing effectuation policy? I think that effectuating focuses less on, it's at the level that these positions are at, where you're effectuating what your defender is doing. You seem to be arguing, but for this statutory change, where the governor gets to do these designations, and the new language, these people would not have been designated under the directing, or the responsibility of directing the effectuation policy. But, with the new language, the designation was proper. That's what you're saying? I, I, this 6.1 allows the governor to make designations. Those are presumptively proper. The governor is in the position to know which positions are managerial level positions, so when that comes out, and that's why the preponderance is dropped out in the directing. The board is focused much more, I think, on the preponderance, because if there's no, if you're not looking at how often, or even whether an employee exercises some authority, does some particular duty, it's the authority itself. So, whether or not you exercise it, we don't, nobody has to prove that they exercise this authority. If somebody, the objector is objecting to the designation, then it's their burden to come in and prove they do not have this authority. So, and, and, and the second, the second prong of the test, which adds to the, I just want to make sure that we're clear. These are, these are two new tests, and actually this is, this was, the governor had a year from April 5th, 2013, to make these designations, and it's a limited number of employees, that could, it was 3580 total, that could be designated out, with 1900 who were already in bargaining units. And the idea is, the point is to give, restore managerial efficiencies and effectiveness in state government. So that's why the governor's designations are presumed to be proper, and it's based on the position, the position's authority, and not whether or not an employee is, is exercising it. But the board, you know, I mean, it's a clearly erroneous standard. The board's, the board's interpretation of the test here is correct, based on the language of the statute, based on the context of it, which the legislature in this same public act amended Section 3J to set up separate tests, so you don't have to have these executive and management functions. And given what the purpose of this legislation is, which is, again, the effectiveness and efficiency of government, which the General Assembly was, recognized was becoming a problem based on the heavy unionization that had occurred over the last several years. So applying that test to the, to the evidence, that's a clearly erroneous, I mean, that's clearly erroneous. And the board's decision based on, well, you know, they, they, all, all of the, the decisions about Wexford and whether or not they're complying with all the, many, many directives and the, and the law and the contract, those decisions are based on what they're getting from the health care unit, health unit, health care unit administrators. They are basically, I mean, they're, they're the state's eyes and ears. I hate to interrupt you, but you've run out of time. I am out of time, I realize that. Thank you, Ms. Purcell. And I ask that you, in full, on behalf of the Labor Board and the Department of Central Management Services, affirm the board's decision that the governor's designation was properly made. Thank you. Mr. Baker, rebuttal? Thank you. I totally agree. Ms. Purcell and I agree on one point, and maybe only one point. One of her closing comments was that a health care unit administrator was the eyes and ears in monitoring a vendor. That's probably true, but that's not enough under Section 6.1B4 to qualify for exclusion. Justice Appleton, if my recollection is correct, asked Ms. Purcell what authorities in a day-to-day sense a health care unit administrator said, and I think I got down to what she said correctly, which was they have the authority to decide what to report concerning what Bucksford was doing. To be true to the record in this case, their authority actually was to determine whether an issue of noncompliance was serious enough to report. And I would submit that's not the type of discretionary authority that qualifies for exclusion under Section 6.1B5. Because the authority has to involve management policies and practices of a state agency, whether it's direct to effectuate or effectuate, what is it they're supposed to direct and effectuate, and deciding what to report is not policies and practices of the state agency. It also does not meet the second prong, because in deciding what to report, in terms of whether it's serious enough to report, doesn't effectively control or implement the policy of the state agency. And to get right down to it, based upon the record in this case, the role of a health care unit administrator at a correctional facility where health care services are not actually provided by the department is pretty limited, and they don't rise to the level of what's required for exclusion under the Act. Thank you very much. Thank you, counsel. We will take this matter under advisement and begin recess. Thank you.